### SAN ANGELO WATER, LIGHT & POWER CO. et al. v. BAUGH. (No. 6837.)*

(Court of Civil Appeals of Texas. Austin. March 9, 1925. Rehearing Denied April 1, 1925.)

**1. Evidence ⬦⟿477(3)—Admitting testimony that plaintiff did not seem for ever so long to be as jolly and good natured as before accident held without error.**

Where whole of witness' testimony was that he was present when plaintiff was injured, and from his actions he looked like he was suffering, and that he had seen plaintiff almost every day for several years before accident, there was no error in permitting his testimony that plaintiff did not seem for ever so long to be as jolly and good natured as before accident.

**2. Evidence ⬦⟿477(2)—General rule as to admission of nonexpert testimony as to physical condition stated.**

Nonexpert witness may state apparent physical condition or as to what are more distinctly inferences from animate bodily phenomena, as existence of state of apparent sickness or disease, and may also state change in apparent condition or what a person's ability to help himself or what physical members or his earning capacity has or has not been impaired.

**3. Appeal and error ⬦⟿1051(2) — Fact that nonexpert witness' testimony as to apparent condition of plaintiff, after accident did not show plaintiff received electrical shock held immaterial.**

As fact that plaintiff received electrical shock was otherwise established, it was immaterial that testimony of witness that plaintiff did not seem for ever so long to be as jolly and good natured as before accident did not show that he received such shock.

**4. Evidence ⬦⟿244(2)—Testimony as to cashier's acceptance of settlement of mutual accounts, including damages to switchboard at time of injury, held without error.**

Where plaintiff alleged that defendant permitted deadly quantity of electricity to escape and enter telephone switchboard, which he was operating, and that he was injured thereby, there was no error in admitting testimony, in nature of admission, that cashier of defendant, in charge of its accounts, accepted settlement of mutual account between plaintiff's employer and defendant, which included damages to switchboard at time plaintiff was injured.

**5. Evidence ⬦⟿219(1) — Evidence tending to show defendant's recognition of liability for negligent act complained of held admissible.**

Testimony which tends to show that defendant recognized liability for damages by negligent act, and which necessarily tends to show that defendant did act which caused liability, is admissible.

**6. Principal and agent ⬦⟿116(1) — When agent's act in apparent scope of authority binding on principal stated.**

Agent's acts within scope of apparent authority in dealing with innocent third persons will bind his principal, although act may not be authorized and in violation of private instructions.

**7. Principal and agent ⬦⟿99 — Principal not permitted to prove agent's authority less extensive than apparent.**

Principal will not be permitted to prove agent's authority was in fact less extensive than that with which he was apparently clothed.

**8. Evidence ⬦⟿590—Jury not bound by testimony of agent, but may consider other facts.**

Jury are not bound by testimony of agent, but may consider all other facts and acts of agent, even though contrary to his testimony.

**9. Appeal and error ⬦⟿1033(3)—Answer to question to defendant's expert witness as to when he last testified for a plaintiff held favorable to defendant.**

In action for personal injury from electrical shock while plaintiff was operating telephone switchboard, answer to question to defendant's expert witness as to last time he testified for a plaintiff in a damage suit that it was in 1919 was favorable to defendant, and error could not be predicated thereon.

**10. Witnesses ⬦⟿372(1) — Broad scope of cross-examination touching witness' interest in case usually permitted in discretion of trial judge.**

Broad scope of cross-examination of witness as to interest in case or matters of bias is usually permitted as resting largely in trial judge's discretion.

---

⬦⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes·
*Writ of error dismissed for want of jurisdiction May 13, 1925.

**11. Evidence** ⊜⇒553(1)—**Facts held to warrant hypothetical question to expert as to proper thing to do when there was trouble on high-power line.**

Where plaintiff alleged personal injury caused by defendant's permitting deadly quantity of electricity to escape from high-power line and enter telephone switchboard, and defendant was notified shortly before accident of trouble on its high-power line, hypothetical question to expert as to what operator should do for safety of public when he received word as to trouble on his high-power line was authorized.

**12. Evidence** ⊜⇒552—**Witness, being expert on matters incorporated in proper hypothetical question, may give opinion thereon.**

Witness, being expert concerning matters incorporated in proper hypothetical question, may give opinion thereon.

**13. Evidence** ⊜⇒363—**Scientific books not received as evidence of matters or opinions they contain.**

Scientific books will not be received as evidence of matters or opinions which they contain.

**14. Trial** ⊜⇒260(1)—**Refusal to give special charge covered by special issues submitted held without error.**

Where court's special charge on special issue to jury substantially covered matters requested by special charge, it was not error to refuse special charge.

**15. Trial** ⊜⇒215—**Denial of special charge calling for general verdict held proper, where case submitted on special issues.**

It was not error to refuse general instruction or charge calling for general verdict, where case was submitted on special issues.

**16. Trial** ⊜⇒215—**Refusal of special charge as to cause inducing electricity to jump from high-power line to telephone line held without error; case being submitted on special issues.**

In view of Vernon's Sayles' Ann. Civ. St. 1914, arts. 1984a, 1985, where liability for defendant's alleged negligence in permitting deadly quantity of electricity to escape from its high-power line was submitted on special issues, it was not error to refuse charge as to defendant's liability if cat climbed on high-power line and cause electricity to jump from that line to telephone line; such special charge calling for general verdict.

**17. Trial** ⊜⇒215—**Refusal of special charge on assumed risk calling for general verdict held proper, where case submitted on special issues.**

In action by operator of telephone switchboard for personal injury from shock alleged to have been caused by negligence of defendant in permitting escape of deadly quantity of electricity from its high-power wire to telephone wire, there was no error in refusal of special charge on assumed risk calling for general verdict, where case was submitted on special issues.

**18. Negligence** ⊜⇒105—**Defense of assumed risk available only in relation of master and servant.**

Defense of assumed risk is available only where relation of master and servant exists.

**19. Trial** ⊜⇒142—**When trial court authorized to instruct verdict stated.**

Trial court is authorized to instruct verdict when evidence is of such character that there is no room for reasonable men honestly to differ as to conclusion to be drawn from it.

**20. Electricity** ⊜⇒19(9)—**Negligence in permitting escape of current held for jury.**

Where plaintiff alleged that defendants permitted deadly quantity of electricity to escape from high-power lines to telephone wires and enter switchboard which he was operating, and thereby injure him, evidence of circumstances and fact that no other possible chance existed where such amount of electricity could have gotten on telephone wire except from power wires *held* to make case for jury.

**21. Electricity** ⊜⇒19(5)—**Finding of negligence in permitting deadly current to escape sustained.**

Evidence *held* sufficient to support jury's special findings of fact fixing liability on owners of high-power line for negligently permitting deadly amount of electricity therefrom to escape to wires of telephone company and injure plaintiff while operating switchboard.

**22. Electricity** ⊜⇒19(5)—**Proof of injury by current from wires in defendant's control makes prima facie case.**

Plaintiff, injured by shock from escape of deadly quantity of electricity from defendant's high-power line, was only required to prove that he received shock which came from wires under exclusive control of defendant to make prima facie case.

**23. Damages** ⊜⇒130(3)—**$4,500 for injuries from electric shock held not excessive.**

Four thousand five hundred dollars damages for injuries to operator of telephone switchboard from shock when deadly quantity of electricity escaped from defendant's high-power line to telephone wires and entered switchboard *held* not excessive.

Appeal from District Court, Tom Green County; C. E. Dubois, Judge.

Action by B. E. Baugh against the San Angelo Water, Light & Power Company and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Wright & Harris, of San Angelo, for appellants.

Hill, Neill & Hill, of San Angelo, for appellee.

BLAIR, J. Appellee, B. E. Baugh, sued appellants, San Angelo Water, Light & Power Company and Texas Electric & Power Company, corporations, charging them jointly and severally with negligently permitting a dangerous, excessive, and deadly quantity

of electricity, generated by them, to escape and enter appellee's place of employment at the switchboard of the San Angelo Telephone Company, at Miles, Tex., alleging that the electricity came onto the telephone apparatus and thence into his body, causing him painful, serious, and permanent bodily injuries, to his damage in the sum of $7,500.

Appellants' answer consisted of a general demurrer, a general denial, a plea of contributory negligence, and a plea of assumed risk.

The case was tried to a jury upon special issues, and judgment was rendered by the court for appellee for $4,500, upon their answers to the special issues submitted; hence this appeal.

[1, 2] Appellants' first proposition complains of the admission of the testimony of witness Palmer that appellee "did not seem for ever so long to be as jolly and good natured as before the accident"; the specific objection being that the testimony did not tend to prove that appellee had received an electric shock, or that he had suffered any permanent or serious injury. The whole of Palmer's testimony in this connection is that he was present when appellee received his injury, and from his actions it looked like he was suffering; that he had occasion to see appellee almost every day for several years before and since the accident, and that "he did not seem for ever so long to be as jolly and good natured as before the accident." The general rule as to the admission of nonexpert testimony of this character is as follows:

"A nonexpert witness 'may state the apparent physical condition of a man, * * * or as to what are more distinctly inferences from animate bodily phenomena, as the existence of a state of apparent sickness or disease. Such an observer may also state a change in apparent condition, whether the change is from sickness to health, or from health to sickness, or from bad to worse, or from worse to better. He may also infer and state that a person's ability to help himself or his faculties or the use of his limbs or other parts of his body, or his earning capacity has or has not been impaired.' 17 Cyc. 87." Yeatts v. St. Louis Swr. Ry. Co. of Tex. (Tex. Civ. App.) 184 S. W. 638; G. H. & S. A. Ry. Co. v. White (Tex. Civ. App.) 216 S. W. 265; Tex. Midland R. R. Co. v. Ritchey, 49 Tex. Civ. App. 409, 108 S. W. 732; Cunningham v. Neal, 49 Tex. Civ. App. 613, 109 S. W. 455; Texas-Mexican Ry. Co. v. Creekmore (Tex. Civ. App.) 204 S. W. 682.

[3] In view of this broad general rule concerning the character of testimony complained of, we do not feel warranted in holding the admission of it erroneous. We think the testimony comes within the rule announced by our courts which permits a nonexpert witness to give his opinion on questions of apparent conditions of the body or mind,

sickness, or health of a person whom he has associated with both before and after an injury in order to give force and meaning to the facts detailed upon which he bases the opinion. The testimony in the instant case detailed the facts that witness had associated with appellee for several years before and after the accident, and that he did not seem so jolly or good natured since the accident as before, which facts tend to show some ill effects of the electrical shock upon appellee's physical being, manner, or bearing, and is admissible. Cunningham v. Neal, supra, and cases there cited. The fact that it does not tend to show that appellee received an electrical shock is immaterial since that fact is otherwise established.

[4, 5] Appellants' second and third propositions complain of the admission of certain testimony in the nature of an admission against interest. John Y. Rust, president and general manager of the San Angelo Telephone Company, by whom appellee was employed, testified on direct examination that appellants paid the telephone company for the damages done to the switchboard at Miles, Tex., at the time appellee was injured. On cross-examination he explained that the payment was made substantially as follows: The appellants and the telephone company ran current monthly accounts with each other. The bill for the damages to the switchboard at Miles, Tex., was $77.97, and was submitted to appellants at their office in San Angelo, Tex., in November, 1923, but not paid at that time; that in the months of February and March, 1924, appellants' bills against the telephone company were $54.68 and $56.76, respectively, making a total of $111.14; that in March, 1924, witness paid appellants' cashier at their office in San Angelo the sum of $33.47, being the difference between appellants' bills for the months of February and March against the telephone company and the telephone company's bill against appellants for damages done to the switchboard at Miles, Tex., at the time appellee was injured; and that since said payment nothing has been said to the telephone company concerning its bill for damages thus paid by the cashier. Appellants' secretary testified that he received the bill when originally presented, and that he passed it to Mr. Treadwell, appellants' general manager, who refused to O. K. it at that time, and that the San Angelo Telephone Company was never credited with said sum on appellants' books. The specific complaint for the admission of this testimony and to the refusal of the court to exclude it upon motion made at the time is that no one authorized by the corporations was shown to have consented to the payment, and that the cashier is not such person as would have the authority to bind the corporation in any wise. As we interpret the record, appellee's purpose in introducing this testimony was that

it tends to show that appellants recognized a liability for the damages occasioned by the negligent act here complained of, and from this necessarily also tends to show that appellants did the act which caused the liability, and for such purposes it is well settled that this character of testimony is admissible. Ry. Co. v. Hertzig, 3 Tex. Civ. App. 296, 22 S. W. 1013; Ry. Co. v. Commerce Union Ins. Co. of London, England (Tex. Civ. App.) 137 S. W. 401; Ry. Co. v. Thomas (Tex. Civ. App.) 167 S. W. 785; Ry. Co. v. Kellerman, 39 Tex. Civ. App. 274, 87 S. W. 401; German Ins. Co. v. Luckett, 12 Tex. Ciy. App. 139, 34 S. W. 173; Ry. Co v. William Land, 3 Willson, Civ. Cas. Ct. App. § 50.

Appellants do not dispute this proposition of law, but insist that the burden was on appellee to show that the cashier acted in the matter upon the authority of appellants when receiving the balance between the accounts, in settlement of the claim for damages, and that the facts show that the said cashier had no such authority. We do not sustain this contention. If, under the above-stated facts, there exists for determination the question of the authority of the cashier to act in this case, we think that authority is established. The cashier in this case was the appellants' agent, who had charge of the collection of accounts due and of the payment of debts owing in the regular course of the business. Rust testified that he never heard the name of N. Y. Company in the matter, unless the cashier said he would take it up with the company; that the cashier accepted the balance between the accounts in settlement at a later date; and that he heard no more about the bill for damages.

[6-8] An agent's acts within the scope of his apparent authority in dealing with innocent third persons will bind the principal for whom he acts, although the act may not be authorized and in violation of private instructions. Merriman v. Fulton, 29 Tex. 97; Ry. v. Hume, 87 Tex. 211, 27 S. W. 110; Hull v. Ry. Co., 66 Tex. 619, 2 S. W. 831; McAlpin v. Ziller, 17 Tex. 508; Gray v. Lumpkin (Tex. Civ. App.) 159 S. W. 880; 2 C. J. 570, 571, § 211, cases cited notes 31 and 32. Neither will a principal be permitted to prove the agent's authority was in fact less extensive than that with which he was apparently clothed. Rosenberg v. Bank (Tex. Civ. App.) 27 S. W. 897; 21 Ruling Case Law, 856. It is also well settled that the jury are not bound by the testimony of the agent, but may consider all other facts and acts of the agent, even though they be contrary to his testimony. Majors v. Goodrich (Tex. Civ. App.) 54 S. W. 919. Appellants made no request that the question of agency be explained to the jury. So we are of the view that no error is presented because of the admission of this testimony. But aside from this question we are also of

the opinion that the question here presented is, not whether the agent had the authority to make the admission against his principals, but is whether the principals by the act of payment through their duly appointed agent tends to show that they recognized a liability for the damages, and that the principals did the act which caused the liability. Rust's testimony is not disputed that he made the settlement payment with appellants' cashier, and that no demand had ever been made by appellants for a return of the money. Appellants' secretary stated that, although he did not have charge of the particular books in question, he happened to know that that balance still remains charged to the telephone company. The books in question were not introduced in evidence. The jury may have concluded under these unexplained facts and circumstances that appellants conceded that the settlement was made and not under any misapprehension, and upon the proper authority of appellants. Under this view of the case the testimony complained of is admissible. Campbell v. Ry. Co., 86 Mo. App. 67.

[9] Appellants' fourth proposition is not sustained. By this they complain that appellee's counsel was permitted to ask one of appellants' witnesses the following question:

"When was the last time you testified for a plaintiff in a damage suit, in an electrical case?"

The question was objected to because it did not show interest or lack of interest of witness in the case, nor why he should swear falsely. The court overruled the objection, and witness answered:

"That it was in 1919 or 1920, in the federal court at Amarillo against the Daugherty interests, the Amarillo Gas & Electric Company, owned by the Daugherty interests."

[10] This answer was undoubtedly favorable to appellants, and no error can be predicated upon it. A broad scope on cross-examination of a witness touching his interest in the litigation, if any, or matters tending to show a possible bias is usually permitted, as resting largely within the sound discretion of the trial judge. 22 C. J. 723; Ry. Co. v. Clifford (Tex. Civ. App.) 148 S. W. 1163; Horton v. Ry. Co., 46 Tex. Civ. App. 639, 103 S. W. 467.

[11] Appellants' fifth proposition complains of the action of the trial court in permitting appellee's counsel to propound to a witness, testifying as an expert electrician, the following question:

"Assuming that the engineer at the power house of the electric company, whose three phase circuit carried 22,000 volts, receives word that there is trouble on his high-powered line, what should the engineer do for the safety of the public, with reference to his high-powered line?"

The question was objected to because unwarranted by the facts, which objection was overruled, and witness answered:

"The proper thing for him to have done would have been for him to pull the switch out, leaving the current off of said line."

We do not sustain the assignment. Miss Ruby King, long distance operator for the San Angelo Telephone Company testified:

"That on that morning she phoned the San Angelo Water, Light & Power Company that their high line was on our long distance line. Phoned this about 6 or 7:30 o'clock. I was getting disturbance over our line. It was more like lightning, more than I can explain, only lightning comes and goes. I did not get a shock. I do not know who answered the phone at the light office."

The night engineer of appellants admitted receiving the notifications from Miss King between 6 and 7:30 a. m. on the morning of the accident, in which she is quoted as saying, "We are having trouble" with your high-power line. He did not pull the switch which took the current off this line. The day engineer appeared about the time of his last notification, and he told him about the notice. Neither of them pulled the switch until about 15 minutes later, when the general manager of appellants phoned them to pull the switch. The chief engineer at the plant testified that appellants had a device or appliance at the plant which would automatically kick off the current on their high power circuit running from San Angelo to Winters in the event of trouble on the line. He also testified:

"It did not kick out that morning. * * * In this instance there was trouble on the line, and it didn't kick out, and I pulled the switch. * * * When I pulled the switch that was answering the purpose of the automatic circuit breaker; it was just the same, the same as if it had kicked out. The circuit breaker can be set in different ways. * * * I don't know where I had it set that morning and couldn't tell you where I customarily keep it set. I cannot tell you where I ought to have it set to take care of 22,000 volts."

The appellants' expert witnesses had testified that they had examined the high-power line and equipment at the power plant a day or two before the trial, and found them in first-class condition.

[12] These facts warrant the asking of the hypothetical question, as being one of the issues on trial, and witness, being an expert concerning the matters incorporated in the question, may give his opinion thereon. Railway v. Bohan (Tex Civ. App.) 47 S. W. 1050; Railway v. McCullough (Tex. Civ. App.) 118 S. W. 558; Scalf v. Collin County, 80 Tex. 514, 16 S. W. 314.

270 S.W.—70

[13] Appellants' sixth proposition is:

"Technical books accepted by its profession as authority should be permitted to be introduced in evidence."

Appellee counters:

"That scientific books will not be received as evidence of the matters or opinions which they contain is well settled."

This counter proposition of appellee seems to be the well-settled law. Jones on Evidence (2d Pocket Ed.) §§ 578 and 579; Fowler v. Lewis, 25 Tex. Supp. 380; Ry. Co. v. Graves (Tex. Civ. App.) 122 S. W. 458; Ry. Co. v. Robertson (Tex. Civ. App.) 200 S. W. 1120.

[14] Appellants' seventh and one-half proposition complains because the court refused the following special charge:

"You are charged that one of the defenses urged by the defendant to plaintiffs' suit is that of contributory negligence, which is meant that the plaintiff by his conduct or negligent acts caused or contributed to the bringing about of the injury complained of, if any such injury was by plaintiff sustained. The particular act of negligence on the part of plaintiff which defendant charges in its pleading was that, plaintiff knowing that the switchboard of the telephone company which he was in charge of was charged with electricity, and being in possession of said knowledge, he undertook to operate said switchboard while it was so charged.

"Therefore you are instructed that, if you believe from the evidence that before and at the time plaintiff picked up the telephone plug to make connection on said switchboard, if he did pick up such plug, he knew that said switchboard was charged with electricity, and that he thereby received a shock, and if you further believe that had he not so picked up said plug he would not have been injured, then you are charged that the picking up of said plug was an act of negligence on his part, and, if you believe that such act either caused or contributed to the injury complained of, you will return a verdict for the defendant."

Special issue No. 5, as given by the court, reads:

"(5) Was the plaintiff, B. E. Baugh, guilty of contributory negligence, as herein defined, in picking up the plug while knowing that electricity was being conducted to the switchboard and plug, and, while so knowing, in placing his bare feet upon the metal rail where the switchboard was located? Answer, 'Yes' or 'No.' "

Appellants' special charge No. 20, given by the court, reads:

"(20) You are charged that by the term contributory negligence heretofore mentioned in the court's charge is meant such act or omission on the part of plaintiff as an ordinarily prudent person would not do under like or similar circumstances, which act or omission, concurring with negligent act or omission, if any, of the defendants, became the proximate cause of injury or contributed to the injury complained of.

"Now, therefore, if you believe from the testimony before you, that at the time of the alleged injury to plaintiff, if any, he knew that the switchboard which he was operating at the time was charged with a dangerous current of electricity, and that it would be dangerous to operate same in such condition, or that he should have known or discovered such condition and its danger by the exercise of ordinary care in the course of his employment, and if you believe that said switchboard was so charged with electricity, and plaintiff knew said fact, and with such knowledge he undertook to operate said board, and was injured thereby, then such act on his part would be negligence, and he would be guilty of contributory negligence, and would not be entitled to recover, and if you so believe, you will return a verdict for defendants."

. This special issue and special charge substantially cover the matter requested to be presented in the special charge under consideration.

Where the court's special issues to the jury substantially cover matters requested to be submitted by a special charge, it is not error to refuse the special charge. Ry. Co. v. Bolton (Tex. Civ. App.) 235 S. W. 215; Davis v. Simmons (Tex. Civ. App.) 240 S. W. 970.

[15] The special charge requested should not have been given because it calls for a general verdict, if the facts embraced be found to be true, while the case was submitted to the jury upon special issues. It is not error to refuse a general instruction or charge calling for a general verdict, where the case is submitted upon special issues. Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 188.

[16] Appellants' eighth proposition is predicated upon the refusal of the court to give the following special charge:

"You are charged that, if you believe from the evidence that a cat climbing upon the defendants' high line and receiving a shock from defendants' high-power wire caused or induced electricity to jump from defendants' wires to the wires of the San Angelo Telephone Company, and thereby the plaintiff received an electric shock, and was injured, and without the act of the cat plaintiff would not have been injured, then you are charged that the defendants would not be responsible for the act of the cat, and, if you so find, the plaintiff cannot recover any damages, and you will find a verdict for the defendants."

It was not error to refuse this special charge, because it is not a special issue, but calls for a general verdict of the jury, whereas the case was submitted upon special issues. Ry. Co. v. Harrington, supra. Articles 1984a and 1985, V. S. C. A. Appellants do not predicate error upon a refusal of the trial court to submit an issue raised by the evidence to the jury, but predicate error upon its refusal to give the special charge requested. Such refusal is not error. City of Austin v. Bush (Tex. Civ. App.) 260 S. W. 300, and cases there cited; Waggoner v. Zundelowitz (Tex. Com. App.) 231 S. W. 721; White v. Bell (Tex. Civ. App.) 242 S. W. 1082; Pullman Co. v. Ry. Co. (Tex. Com. App.) 231 S. W. 741; Town of Jacksonville v. McCraken (Tex. Com. App.) 232 S. W. 294.

[17, 18] Appellants' ninth proposition complains of the action of the trial court in refusing to submit a special charge calling for a general verdict upon their pleaded defense of assumed risk. In addition to the fact that no error can be predicated upon the refusal of the trial court to submit a general charge where the case is submitted upon special issues, the defense of assumed risk is not available, except where the relation of master and servant exists. There is no such relation between appellants and appellee here. Ry. Co. v. Traweek, 84 Tex. 65, 19 S. W. 370; Weatherford Water, etc., Co. v. Veit (Tex. Civ. App.) 196 S. W. 986; Ry. Co. v. De La Cruz (Tex. Com. App.) 228 S. W. 108.

Appellants' seventh proposition, complaining of the refusal of the court to peremptorily instruct a verdict for them, and their fourteenth proposition, which asserts insufficiency of the evidence to support the verdict of the jury and the judgment of the court, will be discussed together. Neither of them is sustained.

[19] The trial court is not authorized to instruct a verdict except in instances where the evidence is of such a character that there is no room for reasonable men to honestly differ as to the conclusion to be drawn from it. Hutchens v. Ry. Co., 40 Tex. Civ. App. 245, 89 S. W. 25; Lee v. Ry. Co., 89 Tex. 583, 36 S. W. 63; Ferrell v. Traction Co. (Tex. Com. App.) 235 S. W. 531; Ry. Co. v. Gaddis (Tex. Com. App.) 208 S. W. 895.

[20] The court would not have been warranted in peremptorily instructing a verdict for appellants under the evidence adduced in this case. We are also of the opinion that the evidence sustains the verdict of the jury and the judgment of the court herein. It is as follows:

The San Angelo Telephone Company's line runs from San Angelo through Miles and Rowena to Ballinger, and is of standard construction. Appellee was at the time of the accident and for many years prior thereto manager of the telephone company at Miles, Tex. The telephone company owned a small one-story building at Miles, in the front of which was located its switchboard, and appellee, his wife, and 13 year old daughter lived in the adjoining rooms. The wife and daughter assisted appellee in operating the switchboard when necessary. On the morning of September 15, 1923, before any of the family were out of bed, the phone rang, and Mrs. Baugh got up and gave the customer, a Mr. Palmer, the number he desired, but because of a disturbing noise on the line he could not hear, and told Mrs. Baugh he would come to the office. Mrs. Baugh retired

to dress for the day, and before Mr. Palmer arrived the daughter answered another call, and retired to dress for the day. Mrs. Baugh then called her husband, who was in bed, and told him that the switchboard was "affected by the high line," and that Mr. Palmer was coming to talk. The term "high line" was the term used to designate appellants' high-power electric line which ran from San Angelo to Miles, Rowena, Ballinger, and Winters, serving these towns and gins along the way with electricity. The "high line" carried 22,000 volts of electricity. The telephone line carried from 90 to 100 volts of electricity. Before Mr. Palmer arrived appellee plugged in on his toll line to the telephone company's main office at San Angelo, ringing the operator, and telling her to tell the light company to cut off its current, as the telephone company was having trouble with its high-power line. The operator had already discovered that appellants' high-power line was on the telephone company's long distance line, and had theretofore telephoned the light company at the place she ordinarily reported such trouble, and upon receiving this message she promptly notified them again of the trouble. Both the appellants' chief engineer and the night engineer at appellants' power plant conceded that these messages were received, but they did not at that time pull the switch that took the current off this high line. Appellee remained at the switch board in his night clothes, and when Mr. Palmer appeared he went into the customer's booth, and appellee made connection for him. In 4 or 5 minutes appellee, upon the ringing of the phone, picked up a plug to make another connection, when he heard a loud report like a gunshot, and was knocked from the switchboard into the doorway of the adjoining bedroom. Mr. Palmer, who was in the booth, and Mrs. Baugh ran to pick him up from where he was lying on the floor, drawn and shaking. Appellee says he knew nothing more until he reached the substation of the appellants at Miles, where he went to try to cut off the electricity. The testimony concerning appellee's injuries will be discussed under another proposition. Appellee, Mrs. Baugh, and Palmer all testified that they heard the loud report and that fire was shooting out of all the little holes on the switchboard, and continued to do so for about a half hour. The rubber insulation was burned off of some "keys" and "jacks" on the switchboard. One of the jacks and about 15 keys had to be removed because they were so badly burned. It took an hour to repair the board for service again. This evidence establishes that appellee received an electric shock, causing bodily injuries. From whence did it come, and who is responsible for its coming? is the next question.

[21] Upon this issue appellee had to rely, in part, upon circumstantial evidence and upon the doctrine of res ipsa loquitur to es-

tablish that appellants were negligent and responsible for its escape. Appellee alleged that appellants negligently permitted an excessive and dangerous amount of electricity, generated by them, to escape and injure him. The telephone company's line and appellants' high-power line substantially parallel one another from Angelo through Miles to Ballinger; then the high-power line continues to Winters. The distance between the telephone line and the high-power line varies from 65 to 80 feet, but in one place between Rowena and Miles the distance between appellants' guy wires supporting the high-power line and the telephone company's wires is 3 feet. The following is a description of the high-power line and its state of repair on the date of the injury:

"The high-powered line consists of a pole line, 35 foot poles, and on top of these poles is a steel 'V' arm, or iron; it is metal, and that has three places for insulators. These insulators are placed on top of what we call brackets or pins. The wire lays on top of the insulation in a groove. There are three wires; judge the wires to be six or eight copper. There is a static wire on top of that line. Part of the static line was there at the time I was hurt. There were places where several spans would be gone and the balance would be up; there were gaps broken out of it. It was on top of the bayonet; that is a piece extending up above the main transmission line fastened to the arm, and the static wire fastens on top of this. The static wire is iron, and the three high-power wires are copper. The bayonet is part of the steel arm, and is fastened to it."

The manager of the telephone company's switchboard at Rowena testified that the toll line could not be used between 7 and 8 o'clock, about the time and on the date appellee was injured, because appellants, power companies, were having trouble from ground with static; that the static wire was broken in places between the poles and not repaired, and that gradually pulled the wire back until it sagged and hit the main wires and caused them to arc. Another witness stated that he was in the harness business at Miles two blocks south of the telephone office where appellee was hurt; that appellants had their telephone in his store, which was not connected with the San Angelo Telephone Company, for whom appellee was working; that between 7 and 7.30 on the morning appellee was hurt the bell of this telephone was ringing quite a good deal, and was shooting a little fire or what looked like fire. An employé of appellants at Ballinger noted sufficient disturbance to cause him to start to inspect the high line about the time appellee was injured. The superintendent of the construction department of the telephone company testified that he went from San Angelo to Miles on the morning of the accident to see how badly appellee was hurt and to repair the switchboard; that he paid particular at-

tention to the condition of the static line all the way, and noticed it was broken in several places, pieces cut out, and swinging low down. Another witness testified that he superintended the construction of appellants' high-power line, and that the static wire was to take care of surges or lightning and such like. Experts testified that it had no particular value, but that, if it came in contact with the high-power line, a ground would be had, and the current could pass to a wire fence or to the telephone line if the contact was sufficiently close to arc. The telephone line had been erected about 25 years and appellants' high-power line about 6 years. There was no other high-power electric line close enough to cause the trouble. The weather was fair, and lightning could not have caused the trouble. Appellants' engineers were notified of the trouble twice before the accident, but did not throw the switch cutting off the current. After the accident the switch was thrown off by order of appellants' general manager, and the current kept off 2 hours and 20 minutes. Appellants' employés were required to inspect this high-power line once every 2 weeks, and in wet, bad weather once each week. It had not been inspected for several days before the accident. Experts testified that high-power lines carrying the amount of voltage that this one carried should be inspected every 2 days for the safety of those living in the immediate vicinity through which it ran. The above evidence describing the facts and circumstances surrounding the injury, aided by the fact that no other possible chance existed where such an amount of electricity could have gotten on the telephone wire and thence into appellee's body, except from appellants' high-power line, is sufficient to require the court to submit the case to the jury, and is sufficient to support their special findings of fact fixing liability upon appellants for negligently permitting excessive and dangerous amounts of electricity generated by them to escape, causing injury.

[22] It is needless for us to discuss here what has already been decided to be the law with reference to the application of the res ipsa loquitur doctrine to this case. Tex. Power & Light Co. v. Bristow (Tex. Civ. App.) 213 S. W. 704. Appellee, to make a prima facie case, was only required to prove that he received an electric shock, which came from wires under the exclusive control of appellants, which injury is such as in the ordinary course of things does not occur if the one having such control uses proper care. Light Co. v. Bristow, supra, and cases there cited. The fact that appellants generated and conducted 22,000 volts of electricity from San Angelo to Miles, that it escaped in such a way as to produce an injury, and that the injury was actually caused from electricity in a place where the party injured had the right to be, would constitute a prima facie

case of negligence, applying to res ipsa loquitur doctrine, unless the appellants showed that such condition was not the result of its negligence. 20 C. J. 381; Telephone Co. v. Shirley (Tex. Civ. App.) 155 S. W. 663. Appellee's prima facie case is further strengthened by the fact that the injury may have been caused by "induced electricity," caused by appellants negligently permitting swinging static wires to remain in such delapidated condition that the wind could blow them in contact with the high-power line, thereby furnishing opportunity for contact. Witnesses testified that they had seen this swinging static wire arc by contact caused by the wind blowing it close to the high-power line. It is further strengthened by the fact that appellants' current breaker failed to perform its function and kick out the switch when the high-power line was in trouble. Appellants' chief engineer, charged with the duty of caring for this safety device, did not know where to set it to cause it to properly function in case of trouble. He did not know at what point it was set on the morning of the accident. The testimony was that they could be so tightened as to prevent them from ever functioning in time of trouble. The switch had to be pulled by hand on the morning in question, although the high line was indisputably in trouble. There was nothing in the evidence which showed that appellee knew anything about what caused the excessive amount of electricity to come onto the telephone line before his injury. The noise and flashings before his injury were what usually happened when the telephone line was affected by appellants' high-power line. He phoned them as usual, telling them of the condition, and requested them to cut off the current. Under these facts and circumstances the findings of the jury that appellants negligently permitted an excessive and dangerous amount of electricity to escape and injure appellees are sufficiently supported by the evidence.

[23] Appellants' fifteenth proposition is that appellee's judgment for $4,500 is excessive. Appellants contend that appellee received a slight shock, and that his injury was of no consequence. Without detailing the evidence, it was shown that appellee was knocked a considerable distance by the shock; that he fell on his back; that he was a large man, weighing 232 pounds; that when his wife and another reached him he was suffering intense pain; his back and neck were bruised; he was partially unconscious; his right hand and toe on left foot were burned; that he appeared to be suffering great agony and pain; that he felt like all the bones in his body had been broken; that he was a strong healthy man before the accident; that since the accident he could not sleep at night; that he was now unable to do a day's work without stopping to rest; that the accident affected his back and lungs more than any-

where else; that he now spits up blood, and prior to the accident he never did so. His wife also stated that he appeared different since the accident; was nervous and did not rest well at night; and could not hold out to do a day's work. Other witnesses testified that he never looked so well after the accident. A doctor was called who said appellee was pale and sick, lying on the bed shaking all over, and seemed to be in misery; and he gave him two hypodermics of morphine; he described abrasions on his neck and back; that he had previously treated him for a light attack of influenza; that since the accident he did not get around as quickly. An X-ray examination disclosed rales in the upper portions of both lungs, and the physician making it testified that he was of the opinion that an electrical shock caused the rales rather than the light attack of influenza; that rales predisposed one to tuberculosis. Appellants showed that appellee went out a few minutes after the accident to try to cut appellants' high-power line out of the town of Miles. Appellee says he knew nothing of going until he reached the substation of appellants, and had to support himself on the fence to keep from falling. He also went about 11 o'clock out to where a cat had been found on the high-power line. He submitted to a physical examination by appellants' physician before the jury. This physician found the rales.

Under these facts we do not feel warranted in holding that the jury's verdict of $4,-500 is so excessive and disproportioned to the injury received as to indicate that their verdict was the result of passion, prejudice, or partiality, requiring an appellate court to set it aside. Ry. Co. v. Stewart, 57 Tex. 166.

Appellants' other assignments and propositions are not sustained, and the trial court's judgment is affirmed.

Affirmed.